**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| UNITED STATES<br>SECURITIES AND EXCHANGE<br>COMMISSION,<br><br>                         Plaintiff,<br><br>         v.<br><br>GARY S. WILLIKY<br><br>                 Defendant. | Civil Action No. 1:15-cv-357<br><br>**Jury Trial Demanded** |

**COMPLAINT**

Plaintiff, the United States Securities and Exchange Commission ("Commission"), alleges as follows:

**NATURE OF THE ACTION**

1.      This case arises from an illegal pump-and-dump and insider trading scheme perpetrated by Gary Williky, a recidivist market manipulator.  Between 2010 and early 2012, Williky engaged in this fraud while working as an investor relations consultant for the Evansville, Indiana-based public company Imperial Petroleum, Inc. ("Imperial"), which purported to manufacture and sell biodiesel fuel through its wholly-owned subsidiary E-biofuels, LLC ("Ebio").  Williky's schemes took place in the following two stages.

2.      First, in the course of his investor relations work for Imperial, Williky engaged in a scheme to manipulate Imperial's stock price.  To do so, Williky: (1) artificially pumped up the volume of Imperial stock through wash and match trades; and (2) engaged in fraudulent

1

"scalping" by touting Imperial stock in emails to approximately 200 recipients without disclosing that he was contemporaneously selling his own shares.  In the course of his fraud, Williky acquired more than 5 percent of Imperial's shares, and he failed to disclose his large ownership stake as required by the federal securities laws.

3.      Second, having accumulated a large position in Imperial stock, Williky engaged in insider trading as he attempted to unload that stock while in possession of negative, nonpublic information about the true nature of Imperial's operations.  As described below, Imperial itself was engaged in significant fraudulent activity:  it was falsely representing to investors and government regulators that it manufactured biodiesel from raw feedstock, which allowed it to attach substantial government incentives and tax credits to the biodiesel and thus sell it at higher prices than biodiesel without such incentives and credits (the "Imperial Fraud").  By at least July 2011, Williky learned that Imperial was lying about its core business — it was not producing most of its biodiesel from raw feedstock as it represented to investors.  By at least November 2011, Williky learned that Imperial's entire biodiesel business was a sham; it was simply buying and reselling finished biodiesel and illegally claiming the government incentives and tax credits available to legitimate biodiesel processors.  During this same time period — while he possessed material, nonpublic information about Imperial's efforts to deceive investors — Williky engaged in a concerted sell-off of his Imperial stock.

4.      Instead of reporting the Imperial Fraud or distancing himself from the company, Williky sought to profit even further.  Williky threatened Imperial that he would report the scam to regulators unless Imperial paid him nearly $1.3 million and issued him 300,000 new shares of Imperial stock.  After receiving those shares from Imperial, Williky sold them while knowing nonpublic information about the Imperial Fraud.

2

5.     By late February 2012, shortly before Ebio filed for bankruptcy, Williky had sold all of his Imperial shares, avoiding losses totaling nearly $800,000.  Williky's total profits in trading Imperial stock between November 2009 and February 2012 amounted to more than $1.3 million.

## JURISDICTION AND VENUE

6.     The Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77v(a)] and Sections 21(e), 21A and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(e), 78u-1, 78aa].

7.     Defendant, directly and indirectly, has made, and is making, use of the means and instrumentalities of interstate commerce and of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

8.     Venue is proper under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within the Southern District of Indiana.  Williky committed the violations alleged herein in the course of his work for Imperial, which was headquartered within this District.  He traveled to and transacted business in the District on a number of occasions in the course of his work and participated in conference calls and email exchanges with members of Imperial's management and other Imperial employees who participated from this District in the course of their employment with Imperial.

## THE DEFENDANT

9.     Gary S. Williky, age 55, is a resident of Colleyville, Texas.  He was a consultant for Imperial from at least February 2010 through December 2011.  In 1994, the Commission

3

charged Williky with violations of the federal securities laws in *SEC v. Williky, et al.*, 94-CV-2088 (N.D. Tex.). The Commission's charges centered on Williky's ownership of a "boiler room" broker-dealer and engagement in a market manipulation scheme.  Williky settled that action and was subsequently barred by the Commission from associating with any broker, dealer, or investment adviser.

**THE FACTS**

## I.        THE IMPERIAL FRAUD

10.        Imperial falsely claimed that it produced more than 28 million gallons of biodiesel from at least May 2010 through at least January 2012.  In reality, Imperial used middlemen to buy finished biodiesel and created fake invoices falsely describing the biodiesel as "feedstock."

11.        By falsely claiming it had produced the biodiesel from raw materials, Imperial was able to illegally claim government incentives and tax credits for biodiesel production and sell the biodiesel for substantially more than its acquisition price.  Specifically, Imperial was able to sell that fuel for more than $100 million, realizing gross profits of more than $50 million. This illegal and unsustainable business model was hidden from Imperial's investors and prospective investors.

12.        Instead, in periodic reports filed with the Commission and provided to shareholders, and in separate statements made to prospective investors, Imperial misrepresented the fundamental nature of its business model by falsely stating that it produced biodiesel from raw feedstock.  Imperial failed to disclose that its business was almost entirely illegal and unsustainable because the substantial government incentives and tax credits it attached to its biodiesel were available only to those who manufactured biodiesel from raw materials.

13.     The Imperial Fraud is the focus of criminal and civil actions filed in this District, including: *SEC v. Imperial Petroleum, Inc., et al.*, No. 13-cv-1489; *United States v. Ducey, et al.*, 13-cr-0189; *United States v. Wilson, et al.*, No. 13-cr-0190; and *United States v. Carmichael*, No. 13-cr-0194.

## II.      WILLIKY'S INTRODUCTION TO IMPERIAL

14.     In October 2009, Williky entered into a confidentiality agreement with Imperial and began talking with its then-CEO, Jeff Wilson, about the company's direction and prospects. At the time, Imperial was a small, publicly-traded oil and gas company whose common stock was registered under Section 12(g) of the Exchange Act.

15.     Williky had a long-standing business relationship with Wilson dating back to the 1990s, when Wilson was the President and Chairman of LaTex Resources, Inc. ("LaTex"). LaTex was a public company that hired Williky's brokerage firm, Chelsea Street, to underwrite public offerings.  Among other activities, and as alleged in the Commission's 1994 lawsuit against Williky, Williky engaged in illegal, manipulative wash and match trades in LaTex stock. After Chelsea Street's involvement with LaTex and the resulting enforcement actions, Williky and Wilson maintained a friendship.  In 1997, Williky loaned $50,000 to Imperial, which Imperial was still repaying in 2009.

16.     The confidentiality agreement Williky entered in October 2009 provided that any discussion regarding Imperial's business information was strictly confidential and not for public use in any manner.  In December 2011, Williky entered into another nondisclosure agreement with Imperial that contained similar language.

17.     Based on his role at Imperial and the confidentiality agreements Williky entered into with Imperial, Williky owed a duty of trust and confidence to Imperial and its shareholders.

18.     In November 2009, after Williky entered into the confidentiality agreement with Imperial, Wilson met with Williky.  Williky pitched Wilson on the idea of hiring him into a "Financial Public Relations" role with Imperial.  Williky's presentation to Wilson stated that Williky would use his expertise in the brokerage industry and his past business relationships to promote Imperial to investors and raise its stock price.  Williky's presentation concluded by telling Wilson to remember that they had raised and made millions of dollars by working together and showing the image of a LaTex stock certificate.

III.    **WILLIKY'S INITIAL SCHEME**

19.     In the course of his investor relations role at Imperial, Williky tried to increase the company's stock price and visibility.  Starting in the spring of 2010, Williky sought to artificially raise Imperial's stock price by increasing trading volume through wash and match trades and touting the stock through mass emails.  Additionally, during the period Williky was actively trading Imperial shares, including at least the period from August 18, 2010 through October 26, 2010, he owned more than 5 percent of the company's outstanding stock and failed to disclose that fact by filing a required beneficial ownership report with the Commission.  By failing to file the required report — and thereby hiding the concentration of shares under his control — Williky further contributed to the false impression of active trading volume created by his wash and match trades.

   A.    **Williky's Market Manipulation**

20.     While working for Imperial, Williky attempted to increase Imperial's trading volume, which conveys to investors liquidity of — and public demand for — a stock.  Between 2009 and 2012, Williky traded Imperial stock in multiple brokerage accounts.  At least three of

these accounts were in his wife's name, but Williky controlled all trading in his own accounts and in his wife's accounts.

21.     From March 4, 2010 through January 11, 2012, Williky used at least five of these accounts to conduct a series of at least 20 wash and match trades.  The details of these wash and match trades are set forth in Exhibit A.

22.     Wash trades, also called "wash sales," are trades in which the beneficial ownership of the securities does not change.  Match trades, also called "matched orders" are trades in which orders are entered with the knowledge that orders of substantially the same size, at substantially the same time and price, have been or will be entered by the same or different persons.  Such transactions operate as a fraud or deceit on the market because the trades, along with their contrived prices, are reported to the market and thereby create a false appearance of market activity that does not reflect the true supply and demand for the securities at issue.  The inflated volume is designed to attract additional market participants and, thereby, artificially increase the stock price.

23.     Williky's trading made up a substantial percentage of Imperial's trading volume between at least March 4, 2010 and January 11, 2012.  Williky's trades resulted in increased trade volume and a higher stock price.  On many days, to increase volume and stock price, Williky both bought and sold Imperial shares.  On more than 70 days within that time period, Williky's trading was responsible for more than 50 percent of the trading volume.  At least five of his wash and match trades were made on such days.  On more than 15 days, Williky was responsible for 100 percent of Imperial's trading volume, including on November 26, 2010, when he made the wash and match trades set forth in Exhibit A.

24.     Williky placed his trading orders via multiple methods, including over the Internet and by telephone.  He made trades in brokerage accounts with broker-dealers located in Rhode Island, Nebraska, New Jersey, and Texas.

25.     In conducting his manipulative wash and match trades, Williky acted with scienter.  He:  (a) controlled trading out of each of the relevant accounts, (b) placed the orders for the trades identified in Exhibit A and (c) knew — or recklessly disregarded — that the trades he directed involved no substantive change of beneficial ownership and/or involved orders of substantially the same size and same price, placed at substantially the same time.

**B.     Williky's Scalping Emails**

26.     While working for Imperial and personally trading in Imperial stock, Williky also hired public relations firms to publicize Imperial and personally sent out emails to more than 200 recipients, including friends, family members, and industry connections.  In his emails, including those described below at paragraphs 27 through 29, Williky promoted Imperial stock without disclosing that he intended to sell his Imperial shares.

27.     On October 5, 2010, a company Williky hired sent out a news release email reporting that Imperial's projected revenue for 2011 was more than $50 million, that Imperial was net profitable, and that the stock price had recently tripled.  Williky then forwarded the message on to his personal connections without disclosing that he was employed by Imperial or that he intended to sell Imperial shares.

28.     On December 6, 2010, Williky emailed another message promoting Imperial's stock.  He claimed that the company was undervalued by more than 400 percent and that the stock price, then trading around $0.55, should be in the range of $2.00 to $2.50.  Williky again

failed to disclose his professional relationship with Imperial or the fact that he intended to sell Imperial shares.

29.     Williky sent another mass email promoting Imperial stock on June 14, 2011. Williky told recipients that the stock had risen almost 300 percent, but he expected that it still had "a long way to go."  He advised "anyone who has not considered becoming a shareholder do so before the stock price is out of current levels of $1.20."  Again, Williky failed to disclose his relationship with Imperial and the fact that he intended to sell Imperial shares.

30.     In the days immediately following each of these emails — in which he told his family, friends and business connections that Imperial was a great buy — Williky was a net seller of Imperial stock and earned profits of more than $60,000.

31.     Williky acted with scienter: he knew when he sent the promotional emails that he had an undisclosed conflict of interest in that he owned — and intended to sell — Imperial shares.

32.     This omission was material.  A reasonable investor would have considered it important that Williky had a material conflict of interest because at the same time that he was recommending that investors purchase Imperial shares, Williky intended to sell his stock.

**C.     Williky's Ownership Levels**

33.     Between 2009 and February 2012, during the course of Williky's work for Imperial and his trading schemes, Williky acquired millions of shares of Imperial stock.  At multiple points throughout this time period, he owned more than 5 percent of the company's outstanding stock.

34.     In one example, at the end of August 2010, Williky owned more than 1.67 million shares of Imperial stock.  At the time, Imperial had 21,364,813 shares outstanding.  Thus,

Williky owned more than 7.8 percent of Imperial's outstanding stock.  He maintained this approximate ownership level until at least October 26, 2010.

35.     Williky was required to file, but never filed, a beneficial ownership report form with the Commission disclosing that he owned more than 5 percent of the company's stock.

## IV.     WILLIKY'S INSIDER TRADING

36.     By at least July 10, 2011, Williky knew that Imperial was not telling the investing public the truth about its operations.  By at least that date, Williky was told that Imperial was using "off-spec" fuel in its manufacturing process.  This was a nonpublic cover story Imperial circulated internally — and to select third parties subject to confidentiality agreements — to conceal the true extent of the Imperial Fraud.  By August 2011, Williky explicitly was told that manufacturing biodiesel from "off-spec" fuel was contrary to representations Imperial had made to investors.  By or before November 2011, Williky knew that Imperial's purported biodiesel operations were a complete sham and that Imperial was lying to the investing public.

37.     Williky took advantage of this material, nonpublic information by selling Imperial shares throughout the period between July 10, 2011 and February 27, 2012, when he sold his last shares. During this period, by selling his Imperial shares, Williky avoided total losses of approximately $800,000.

### A.     Williky's Knowledge of the "Off-Spec" Cover Story

38.     In late May of 2011, Williky connected Imperial with a broker-dealer and investment banking firm (the "Investment Bank").  Imperial hired the Investment Bank as its exclusive placement agent for a proposed offering of Imperial securities.

39.     On June 18, 2011, Williky entered into a second consulting agreement with Imperial in exchange for additional Imperial shares and warrants.

40.     In June 2011, Wilson and Williky began promoting Imperial to potential investors during multiple "Road Show" conference calls set up by the Investment Bank.  During the Road Show calls, Wilson repeated false claims that Imperial produced biodiesel from raw feedstock, primarily premium white grease (i.e., chicken fat).

41.     But by July 10, 2011, Williky knew that Imperial's representations to investors were false.  By that date, Imperial executives had informed Williky that Imperial was producing biodiesel from "off-spec" materials as opposed to raw feedstock.

42.     Imperial's "off-spec" cover story was designed to prevent discovery of the true nature of its biodiesel operations.  Imperial executives informed Williky that they were producing biodiesel from fuel that was not up to standards and required additional processing before it could be sold as biodiesel.  In fact, Imperial did not use "off-spec" materials as feedstock:  it purchased finished biodiesel, made no changes to it and fraudulently certified that it produced the biodiesel to attach tax credits and government incentives.

43.     Although it was a lie, the "off-spec" cover story was revealing.  In hearing this story from Imperial executives, Williky was privy to the nonpublic — and true — information that Imperial was not producing its biodiesel from raw feedstock as it claimed in its public filings and representations to investors and potential investors.

44.     Williky also knew that the one potential investor who heard Imperial's purported use of "off-spec" materials chose not to invest in Imperial.

45.     In one of the Road Show calls, the Investment Bank introduced Imperial to a potential hedge fund investor.  In mid-July, after entering into a nondisclosure agreement, the hedge fund agreed to provide Imperial up to $27.5 million in exchange for notes and Imperial stock contingent on the satisfactory completion of its due diligence review.  After the hedge fund

tentatively agreed to invest, it began asking questions about Imperial's feedstock vendors and the sustainability of its profit margins.

46.     On August 1, 2011, Wilson informed the hedge fund that Imperial used "off-spec" materials to produce biodiesel and that in doing so Imperial achieved favorable margins.

47.     An Investment Bank official working with Imperial expressed concern about this revelation.  After he learned of Wilson's statement, the Investment Bank official had a telephone conversation with Wilson and Williky.  In that conversation, Wilson acknowledged that very little of Imperial's revenue came from processing raw feedstock, but he falsely stated that most of the company's revenues came from its use of "off-spec" materials.

48.     The Investment Bank official further told Wilson and Williky that none of Imperial's Commission filings mentioned the use of "off-spec" materials and asked whether they thought that Imperial's Forms 10-K and 10-Q should be updated so that investors were not misled.  Wilson agreed that Imperial's filings should be amended.

49.     Imperial never amended any of its public filings to disclose that it was using "off-spec" materials.

50.     By August 5, 2011, the hedge fund informed Imperial that any biodiesel manufactured from "off-spec" materials would not qualify for government incentives and therefore Imperial's sale of such fuel with attached incentives was illegal.

51.     That same day, Wilson relayed these concerns to Williky by email and reiterated the hedge fund's conclusion that if Imperial was in fact using "off-spec" materials, it could not attach the valuable government incentives to its biodiesel, because they were available only if Imperial was producing biodiesel from raw feedstock.

52.     By August 9, 2011, the hedge fund informed Imperial that because Imperial was not manufacturing biodiesel from raw materials, it would not invest in Imperial.

53.     Imperial's disclosure in August 2011 to the prospective hedge fund investor regarding its use of "off-spec" fuel reflected material information that was never disseminated to the investing public: Imperial was not manufacturing biodiesel from raw materials.

54.     While in possession of — and on the basis of — the nonpublic information that Imperial did not exclusively manufacture biodiesel from raw feedstock, Williky was a significant net seller of Imperial stock and avoided significant losses.

55.     From July 10, 2011 until November 18, 2011, Williky avoided losses of approximately $495,365 by trading in Imperial stock.  Williky's Imperial trades during that time period are reflected on the attached Exhibit B.

**B.     Williky's Knowledge of the Imperial Fraud**

56.     After August 2011, Williky gained even more material, nonpublic knowledge regarding Imperial's fraudulent business model and yet continued to be a net seller in Imperial stock.  Aside from occasional purchases of Imperial shares in the market, Williky spent the next several months unloading his shares.

57.     In early November 2011, Wilson resigned as Imperial's president and Chairman of the Board.  Imperial named Williky's long-time friend John Ryer ("Ryer") to succeeded Wilson.  After Ryer was named president, Joe Furando ("Furando"), the owner of Imperial's main supplier and an indicted co-conspirator and current defendant in the Imperial Fraud cases referenced in Paragraph 13, demanded an in-person meeting at Furando's offices in New Jersey.

58.     On approximately November 16, 2011, Ryer and Williky communicated about ways to record Ryer's conversations with Furando.  To that end, Williky advised Ryer to secretly record his conversation with Furando.

59.     On November 17, 2011, Ryer met with Furando in New Jersey and recorded their conversation.  Ryer's recording captured Furando explaining Imperial's true, illegal business model.  Furando explained that Imperial purchased finished fuel, as opposed to feedstock or "off-spec" materials, from Furando's company, pretended to manufacture that fuel so that it could claim government incentives, and then resold the fuel unchanged.  The recording established that Imperial's true business model was far different from what it represented to the public and investors.

60.     On or before November 18, 2011, Ryer called Williky and told him that Furando revealed that Imperial was cheating by purchasing finished fuel, not feedstock, from Furando's company.  The following week, Ryer provided Williky with the secret recording Ryer had made.

61.     The information Williky learned from Ryer and Ryer's recording about Imperial was not disclosed to the general public before or after the date of the recording.  Williky knew that Imperial was not only lying to investors about manufacturing fuel from feedstock, its entire biodiesel business was a fraud.  From November 19, 2011 until February 27, 2012 — while in possession of, and on the basis of, that material nonpublic information — Williky took advantage, using that information to avoid losses of approximately $302,852 by selling Imperial stock.  Williky's Imperial trades during that time period are reflected on the attached Exhibit B.

## V.     WILLIKY'S THREAT TO REPORT IMPERIAL TO THE SEC AND EPA

62.     In addition to trading Imperial stock for his personal accounts while in possession of secret information from Ryer's recording, Williky used that information to extort $1.24

million in cash and an additional 300,000 shares from Imperial in the form of additional compensation.

63.     On November 30, 2011, Williky told Imperial's counsel that if Imperial did not pay him $1.3 million and issue him new Imperial shares and warrants, he would report the company to the SEC and EPA.

64.     Williky's effort to profit from his knowledge of Imperial's fraud was successful. On December 2, 2011, Williky and Imperial entered into a Severance, Confidentiality and Nondisclosure Agreement providing that Imperial would pay Williky $1,237,500.00 and issue him 300,000 shares of common stock.  In return, Williky would keep confidential information he had learned in the course of his relationship with the company and would not disparage Imperial.

65.     After receiving the 300,000 shares of Imperial stock — but before the public learned of the Imperial Fraud — Williky sold those shares as set forth in Exhibit B.

## MARKET MANIPULATION

### COUNT I

### Violations of Section 9(a)(1) of the Exchange Act

66.     Paragraphs 1 through 65 and Exhibits A and B are realleged and incorporated by reference herein.

67.     Williky, directly or indirectly, with scienter, by use of the mails or any means or instrumentality of interstate commerce, for the purpose of creating a false and misleading appearance of active trading in Imperial securities while they were quoted on OTC Link, an interdealer quotation system for over-the-counter securities, or for the purpose of creating a false or misleading appearance with respect to the market for Imperial securities while they were quoted on OTC Link, engaged in the following unlawful activity:

> a)      Effected transactions in the securities which involved no change in the beneficial ownership thereof;
>
> b)      Entered an order or orders for the purchase of the securities with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of the securities, had been or would be entered by or for the same or different parties; or
>
> c)      Entered an order or orders for the sale of the securities with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of the securities, had been or would be entered by or for the same or different parties.

68.     Williky, directly or indirectly, with scienter, by the use of the mails or any means or instrumentality of interstate commerce, effected, alone or with one or more other persons, a

16

series of transactions in Imperial securities creating actual or apparent active trading in those securities for the purpose of inducing the purchase or sale of those securities by others.

69.     Williky violated, and unless enjoined will again violate, Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)].

## COUNT II

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Thereunder

70.     Paragraphs 1 through 65 and Exhibits A and B are realleged and incorporated by reference herein.

71.     Williky, directly or indirectly by use of the instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly: (a) employed devices, schemes or artifices to defraud and/or (b) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon purchasers and prospective purchasers of the securities offered and sold by Williky and other persons.

72.     By reason of the foregoing, Williky violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5(a) and (c)] thereunder.

## INSIDER TRADING

### COUNT III

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

73.     Paragraphs 1 through 65 and Exhibit B are realleged and incorporated by reference herein.

74.     Williky knew, or was reckless in not knowing, that the information detailed above about Imperial's biodiesel manufacturing, or lack thereof, was confidential, material and nonpublic.

75.     Williky breached the duty of trust and confidence he owed to Imperial and its shareholders by trading in Imperial securities using that information.

76.     Williky, in connection with the purchase or sale of securities, directly or indirectly by use of the instrumentalities of interstate commerce, or of the mails: (a) used or employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon purchasers and prospective purchasers of the securities sold by Williky and other persons.

77.     Williky acted knowingly or recklessly when he engaged in the fraudulent conduct described above.

78.     By reason of the foregoing, Williky violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

**COUNT IV**

**Violations of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)]**

79.     Paragraphs 1 through 65 and Exhibit B are realleged and incorporated by reference herein.

80. Williky knew, or was reckless in not knowing, that the information detailed above about Imperial's biodiesel manufacturing, or lack thereof, was confidential, material and nonpublic.

81. Williky breached the duty of trust and confidence he owed to Imperial and its shareholders by trading in Imperial securities using that information.

82. By the conduct described above, Williky, in the offer or sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly employed devices, schemes or artifices to defraud.

83. Williky acted knowingly or recklessly when he engaged in the fraudulent conduct described above.

84. By reason of the conduct described above, Williky has violated and unless enjoined will again violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT V

**Violations of Section 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)]**

85. Paragraphs 1 through 65 and Exhibit B are realleged and incorporated by reference herein.

86. Williky knew, or was reckless in not knowing, that the information detailed above about Imperial's biodiesel manufacturing, or lack thereof, was confidential, material and nonpublic.

87. Williky breached the fiduciary duty of trust and confidence that he owed to Imperial and its shareholders by trading in Imperial securities using that information.

88. Williky, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or

indirectly obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made; not misleading; and engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser of securities.

89.     By reason of the conduct described above, Williky has violated and unless enjoined will again violate Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)].

**SCALPING**

**COUNT VI**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

90.     Paragraphs 1 through 65 and Exhibit B are realleged and incorporated by reference herein.

91.     Williky, directly or indirectly, by use of the instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, as described herein, knowingly, willfully, or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon purchasers and prospective purchasers of the securities offered and sold by Williky and other persons.

20

**92.**     By reason of the foregoing, Williky violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

**COUNT VII**

**Violations of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)]**

93.     Paragraphs 1 through 65 and Exhibit B are realleged and incorporated by reference herein.

94.     Williky, directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in the offer or sale of securities, as described in this Complaint knowingly, willfully or recklessly employed devices, schemes or artifices to defraud.

95.     By reason of the conduct described above, Williky has violated and unless enjoined will again violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

**COUNT VIII**

**Violations of Section 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)]**

96.     Paragraphs 1 through 65 and Exhibit B are realleged and incorporated by reference herein.

97.     Williky, directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in the offer or sale of securities: (a) obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not

misleading, or (b) engaged in transactions, practices and courses of business which operated as a fraud or deceit upon purchasers and prospective purchasers of such securities.

98.     By reason of the conduct described above, Williky has violated and unless enjoined will again violate Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (3)].

## OWNERSHIP DISCLOSURE

### COUNT IX

### Violations of Section 13(d) of the Exchange Act and Rule 13d-1 Thereunder

99.     Paragraphs 1 through 65 and Exhibit B are realleged and incorporated by reference herein.

100.    The common stock of Imperial was registered pursuant to Section 12 of the Exchange Act and was quoted on OTC Link, an interdealer quotation system for over-the-counter securities.

101.    At multiple times between 2010 and 2011, including but not limited to at least the period between August 2010 and October 2010, Williky, together with accounts in his wife's name, directly or indirectly beneficially owned substantially more than 5 percent of the issued and outstanding shares of Imperial and failed to report his beneficial ownership in Imperial.

102.    By reason of the foregoing, Williky violated Section 13(d) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 13d-1 thereunder [17 C.F.R. 240.13d-1].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

I.

Issue findings of fact and conclusions of law that the Defendant committed the alleged violations.

## II.

Issue an Order of Permanent Injunction, in a form consistent with Federal Rule of Civil Procedure 65(d), restraining and enjoining Defendant from violating Section 17(a) of the Securities Act and Sections 9(a), 10(b), and 13(d) of the Exchange Act and Rules 10b-5 and 13d-1 thereunder.

## III.

Order Defendant to disgorge all ill-gotten gains and illegally avoided losses, with prejudgment interest.

## IV.

Order Defendant to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u-1].

## V.

Order that, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(d)(4)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], Defendant is prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

VII.

Grant such other and further relief as may be necessary and appropriate.

VIII.

Retain jurisdiction of this action to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

Respectfully submitted,

DATED: March 2, 2015

s/ Anne Graber Blazek
ANNE GRABER BLAZEK
   (312) 886-8505 / blazeka@sec.gov
BENJAMIN J. HANAUER
   (312) 353-8642 / hanauerb@sec.gov
TIMOTHY LEIMAN
   (312) 353-5213 / leimant@sec.gov

Attorneys for Plaintiff
U.S. SECURITIES AND EXCHANGE
COMMISSION
Chicago Regional Office
175 West Jackson Boulevard, Suite 900
Chicago, Illinois  60604