# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| vs. | ) Cause No. 1:15-cv-0357-WTL-MJD<br>) |
| GARY S. WILLIKY, | )<br>) |
| Defendant. | ) |

## ENTRY ON PENDING MOTIONS

This cause is before the Court on the Securities and Exchange Commission's ("SEC") Motion for Entry of Judgment, by Consent, of Permanent Injunction and Other Relief, Dkt. No. 34, and Motion for Injunctions, Disgorgement, Civil Penalties, and Entry of Final Judgment, Dkt. No. 38. The motions are fully briefed and the Court, being duly advised, grants the relief set forth below.

### I.     Facts

The parties have entered into a bifurcated settlement agreement in which the parties agree that (1) Gary S. Williky shall be enjoined from violating the provisions of the federal securities laws at issue in the Complaint; (2) Williky shall be enjoined from serving as an officer or director of a public company; and (3) the Court shall determine the financial penalties to be assessed against Williky via motion. Dkt. No. 34-2 at 1-2. The SEC seeks to disgorge Williky of profits and prejudgment interest and to impose civil penalties against Williky. Pursuant to the consent order, Williky is precluded from arguing that he did not violate the federal securities laws as alleged in the Complaint, and the Court is to accept the allegations in the Complaint as true. Dkt. No. 34-2 at 2-3.

## A. Stipulated Wrongdoing

As noted, the parties have stipulated that the Court is to accept the allegations in the Complaint as true. Dkt. No. 34 at 2. These allegations, in relevant part, are summarized below.

Gary S. Williky is a 55-year-old resident of Colleyville, Texas, who was an investor-relations consultant for the Evansville, Indiana-based public company Imperial Petroleum, Inc., from February 2010 through December 2011.

### 1. *Williky's Market Manipulation*

While working for Imperial, Williky attempted to increase Imperial's trading volume, which conveys to investors liquidity of — and public demand for — a stock. Between 2009 and 2012, Williky traded Imperial stock in multiple brokerage accounts. At least three of these accounts were in his wife's name, but Williky controlled all trading in his own accounts and in his wife's accounts. From March 4, 2010, through January 11, 2012, Williky used at least five of these accounts to conduct a series of at least twenty wash and match trades.[1]

Williky's trading made up a substantial percentage of Imperial's trading volume between at least March 4, 2010, and January 11, 2012. Williky's trades resulted in increased trade volume and a higher stock price. On many days, to increase volume and stock price, Williky both bought and sold Imperial shares. On more than seventy days within that time period, Williky's trading was responsible for more than fifty percent of the trading volume. At least five

---

[1] Wash trades, also called "wash sales," are trades in which the beneficial ownership of the securities does not change. Match trades, also called "matched orders" are trades in which orders are entered with the knowledge that orders of substantially the same size, at substantially the same time and price, have been or will be entered by the same or different persons. Such transactions operate as a fraud or deceit on the market because the trades, along with their contrived prices, are reported to the market and thereby create a false appearance of market activity that does not reflect the true supply and demand for the securities at issue. The inflated volume is designed to attract additional market participants and thereby artificially increase the stock price.

of his wash and match trades were made on such days. On more than fifteen days, Williky was responsible for one hundred percent of Imperial's trading volume.

In conducting his manipulative wash and match trades, Williky acted with scienter. He: (1) controlled trading out of each of the relevant accounts, (2) placed the orders for the trades and (3) knew — or recklessly disregarded — that the trades he directed involved no substantive change of beneficial ownership and/or involved orders of substantially the same size and same price, placed at substantially the same time.

2. *Williky's Scalping Emails*

While working for Imperial and personally trading Imperial stock, Williky hired public relations firms to publicize Imperial and personally sent out emails to more than two hundred recipients, including friends, family members, and industry connections. In his emails, Williky promoted Imperial stock without disclosing that he intended to sell his Imperial shares.

For example, on October 5, 2010, a company Williky hired sent out a news release email reporting that Imperial's projected revenue for 2011 was more than $50 million, that Imperial was net profitable, and that the stock price had recently tripled. Williky then forwarded the message to his personal connections without disclosing that he was employed by Imperial or that he intended to sell Imperial shares.

Similarly, on December 6, 2010, Williky emailed another message promoting Imperial's stock. He claimed that the company was undervalued by more than four hundred percent and that the stock price, then trading around $0.55, should be in the range of $2.00 to $2.50. Williky again failed to disclose his professional relationship with Imperial or the fact that he intended to sell Imperial shares.

Finally, Williky sent another mass email promoting Imperial stock on June 14, 2011. Williky told recipients that the stock had risen almost three hundred percent, but he expected that

it still had "a long way to go." He advised "anyone who has not considered becoming a shareholder do so before the stock price is out of current levels of $1.20." Again, Williky failed to disclose his relationship with Imperial and the fact that he intended to sell Imperial shares.

In the days immediately following each of these emails — in which he told his family, friends and business connections that Imperial was a great buy — Williky was a net seller of Imperial stock and earned profits of more than $60,000.

Williky acted with scienter: he knew when he sent the promotional emails that he had an undisclosed conflict of interest in that he owned — and intended to sell — Imperial shares. This omission was material. A reasonable investor would have considered it important that Williky had a material conflict of interest because at the same time that he was recommending that investors purchase Imperial shares, Williky intended to sell his stock.

### 3. *Williky's Ownership Levels*

Between 2009 and February 2012, while working for Imperial and trading its stock, Williky acquired millions of shares of Imperial stock. At multiple points throughout this time period, he owned more than five percent of the company's outstanding stock.

In one example, at the end of August 2010, Williky owned more than 1.67 million shares of Imperial stock. At the time, Imperial had 21,364,813 shares outstanding. Thus, Williky owned more than 7.8 percent of Imperial's outstanding stock. He maintained this approximate ownership level until at least October 26, 2010.

Williky was required to file, but never filed, a beneficial ownership report form with the Commission disclosing that he owned more than five percent of the company's stock.

####    4.   *Williky's Insider Trading*

####    a.   *The Imperial Fraud*

Imperial falsely claimed that it produced more than 28 million gallons of biodiesel from at least May 2010 through at least January 2012. In reality, Imperial used middlemen to buy finished biodiesel and created fake invoices falsely describing the biodiesel as "feedstock."

By falsely claiming it had produced the biodiesel from raw materials, Imperial was able to illegally claim government incentives and tax credits for biodiesel production and sell the biodiesel for substantially more than its acquisition price. Specifically, Imperial was able to sell the fuel for more than $100 million, realizing gross profits of more than $50 million.

This illegal and unsustainable business model was hidden from Imperial's investors and prospective investors. Instead, in periodic reports filed with the Commission and provided to shareholders, and in separate statements made to prospective investors, Imperial misrepresented the fundamental nature of its business model by falsely stating that it produced biodiesel from raw feedstock. Imperial failed to disclose that its business was almost entirely illegal and unsustainable because the substantial government incentives and tax credits it attached to its biodiesel were available only to those who manufactured biodiesel from raw materials.

By at least July 10, 2011, Williky knew that Imperial was not telling the investing public the truth about its operations. By at least that date, Williky was told that Imperial was using "off-spec" fuel in its manufacturing process. This was a nonpublic cover story Imperial circulated internally — and to select third parties subject to confidentiality agreements — to conceal the true extent of the Imperial fraud. By August 2011, Williky explicitly was told that manufacturing biodiesel from "off-spec" fuel was contrary to representations Imperial had made to investors. By November 2011, Williky knew that Imperial's purported biodiesel operations were a complete sham and that Imperial was lying to the investing public.

Williky took advantage of this material, nonpublic information by selling Imperial shares throughout the period between July 10, 2011, and February 27, 2012, when he sold his last shares. During this period, by selling his Imperial shares, Williky avoided total losses of approximately $800,000.

### b. *Williky's Knowledge of the "Off-Spec" Cover Story*

In June 2011, Imperial's then-CEO, Jeff Wilson, and Williky began promoting Imperial to potential investors during multiple "Road Show" conference calls set up by the investment bank hired as an exclusive placement agent for a proposed offering of Imperial securities (the "Investment Bank"). During the Road Show calls, Wilson repeated false claims that Imperial produced biodiesel from raw feedstock, primarily premium white grease (i.e., chicken fat). But by July 10, 2011, Williky knew that Imperial's representations to investors were false. By that date, Imperial executives had informed Williky that Imperial was producing biodiesel from "off-spec" materials as opposed to raw feedstock.

Imperial's "off-spec" cover story was designed to prevent discovery of the true nature of its biodiesel operations. Imperial executives informed Williky that they were producing biodiesel from fuel that was not up to standards and required additional processing before it could be sold as biodiesel. In fact, Imperial did not use "off-spec" materials as feedstock: it purchased finished biodiesel, made no changes to it, and fraudulently certified that it produced the biodiesel to attach tax credits and government incentives.

Although it was a lie, the "off-spec" cover story was revealing. In hearing this story from Imperial executives, Williky was privy to the nonpublic — and true — information that Imperial was not producing its biodiesel from raw feedstock as it claimed in its public filings and representations to investors and potential investors. Notably, Williky also knew that the one

6

potential investor who heard Imperial's purported use of "off-spec" materials chose not to invest in Imperial.

In one of the Road Show calls, the Investment Bank introduced Imperial to a potential hedge fund investor. In mid-July, after entering into a nondisclosure agreement, the hedge fund agreed to provide Imperial up to $27.5 million in exchange for notes and Imperial stock, contingent on the satisfactory completion of its due diligence review. After the hedge fund tentatively agreed to invest, it began asking questions about Imperial's feedstock vendors and the sustainability of its profit margins.

On August 1, 2011, Wilson informed the hedge fund that Imperial used "off-spec" materials to produce biodiesel and that in doing so Imperial achieved favorable margins. An Investment Bank official working with Imperial expressed concern about this revelation. After he learned of Wilson's statement, the Investment Bank official had a telephone conversation with Wilson and Williky. In that conversation, Wilson acknowledged that very little of Imperial's revenue came from processing raw feedstock, but he falsely stated that most of the company's revenues came from its use of "off-spec" materials.

The Investment Bank official further told Wilson and Williky that none of Imperial's Commission filings mentioned the use of "off-spec" materials and asked whether they thought that Imperial's Forms 10-K and 10-Q should be updated so that investors were not misled. Wilson agreed that Imperial's filings should be amended. Imperial never amended any of its public filings to disclose that it was using "off-spec" materials.

By August 5, 2011, the hedge fund informed Imperial that any biodiesel manufactured from "off-spec" materials would not qualify for government incentives and therefore Imperial's sale of such fuel with attached incentives was illegal. That same day, Wilson relayed these concerns to Williky by email and reiterated the hedge fund's conclusion that if Imperial was in

7

fact using "off-spec" materials, it could not attach the valuable government incentives to its biodiesel, because they were available only if Imperial was producing biodiesel from raw feedstock. By August 9, 2011, the hedge fund informed Imperial that because Imperial was not manufacturing biodiesel from raw materials, it would not invest in Imperial.

Imperial's disclosure in August 2011 to the prospective hedge fund investor regarding its use of "off-spec" fuel reflected material information never disseminated to the investing public: Imperial was not manufacturing biodiesel from raw materials.

While in possession of — and on the basis of — the nonpublic information that Imperial did not exclusively manufacture biodiesel from raw feedstock, Williky was a significant net seller of Imperial stock and avoided significant losses. From July 10, 2011 until November 18, 2011, Williky avoided losses of approximately $495,365 by trading in Imperial stock.

          c.        *Williky's Knowledge of the Imperial Fraud*

After August 2011, Williky gained even more material, nonpublic knowledge regarding Imperial's fraudulent business model and yet continued to be a net seller in Imperial stock. Aside from occasional purchases of Imperial shares in the market, Williky spent the next several months unloading his shares.

In early November 2011, Wilson resigned as Imperial's president and Chairman of the Board. Imperial named Williky's long-time friend John Ryer to succeed Wilson. After Ryer was named president, Joe Furando, the owner of Imperial's main supplier, demanded an in-person meeting at Furando's offices in New Jersey. Williky advised Ryer to secretly record his conversation with Furando.

On November 17, 2011, Ryer met with Furando in New Jersey and recorded their conversation. Ryer's recording captured Furando explaining Imperial's true, illegal business model. Furando explained that Imperial purchased finished fuel, as opposed to feedstock or "off-

spec" materials, from Furando's company, pretended to manufacture that fuel so that it could claim government incentives, and then resold the fuel unchanged. The recording established that Imperial's true business model was far different from what it represented to the public and investors.

On or before November 18, 2011, Ryer called Williky and told him that Furando revealed that Imperial was cheating by purchasing finished fuel, not feedstock, from Furando's company. The following week, Ryer provided Williky with the secret recording Ryer had made.

The information Williky learned from Ryer and Ryer's recording about Imperial was not disclosed to the general public before or after the date of the recording. At this time, Williky knew that Imperial was not only lying to investors about manufacturing fuel from feedstock, but also that its entire biodiesel business was a fraud. From November 19, 2011, until February 27, 2012 — while in possession of, and on the basis of, that material nonpublic information — Williky took advantage, using that information to avoid losses of approximately $302,852 by selling Imperial stock.

*5.    Williky's Threat to Report Imperial to the SEC and the Environmental Protection Agency*

In addition to trading Imperial stock for his personal accounts while in possession of secret information from Ryer's recording, Williky used that information to extort $1.24 million in cash and an additional 300,000 shares from Imperial in the form of additional compensation.

On November 30, 2011, Williky told Imperial's counsel that if Imperial did not pay him $1.3 million and issue him new Imperial shares and warrants, he would report the company to the SEC and EPA.

Williky's effort to profit from his knowledge of Imperial's fraud was successful. On December 2, 2011, Williky and Imperial entered into a Severance, Confidentiality and Nondisclosure Agreement providing that Imperial would pay Williky $1,237,500 and issue him

300,000 shares of common stock. In return, Williky would keep confidential information he had learned in the course of his relationship with the company and would not disparage Imperial.

After receiving the 300,000 shares of Imperial stock — but before the public learned of the Imperial fraud — Williky sold those shares.

## II.    Discussion

### A.    Disgorgement and Prejudgment Interest

The SEC seeks to disgorge Williky of his illegal profits. "Disgorgement is a form of restitution," *SEC v. Lipson*, 278 F.3d 656, 662-63 (7th Cir. 2002), which "extends only to the amount with interest by which the defendant profited from his wrongdoing," *SEC v. MacDonald*, 699 F.2d 47, 54 (7th Cir. 1983). The amount disgorged "need only be a reasonable approximation of profits causally connected to the wrongdoing" and "any risk of uncertainty in calculating disgorgement should fall on the defendant whose conduct created the uncertainty." *SEC v. Patel*, 61 F.3d 137, 139-40 (2d Cir. 1995) (internal quotation marks and alterations omitted). An award of prejudgment interest should accompany disgorgement because "'prejudgment interest is an element of complete compensation.'" *SEC v. Koenig*, 557 F.3d 736, 745 (7th Cir. 2009) (quoting *West Virginia v. United States*, 479 U.S. 305, 310 (1987)) (alteration removed). Williky does not contest the validity of the SEC's calculations, but argues that the SEC has overreached with regard to certain amounts sought.

#### 1.    *Proceeds of Insider Trading*

The SEC seeks to disgorge $798,217 in proceeds of Williky's insider trading. Dkt. No. 39 at 13. Williky categorizes these proceeds as "$495,365 for trading from July 10, 2011, to November 18, 2011 based on Williky's 'knowledge of the off-spec' fuel in the manufacturing process," and "$302,852 for trading from November 19, 2011 – February 27, 2012 after Williky received the transcript of the Furando/Ryer conversation." Dkt. No. 48 at 20. Williky does not

10

dispute the disgorgement of $302,852 based on his trading after receiving the transcript, but does dispute the disgorgement of $495,365 based on his knowledge of the "off-spec" cover story.

In disputing this disgorgement, Williky argues

> The test for materiality is that "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway*, 426 U.S. 438 (1976). However, Imperial never stated to the public that it was producing biodiesel EXCLUSIVELY from "raw feedstock" as stated by the SEC. Imperial's statement in its Form 10-Q, publicly filed on October 14, 2011, stated that "E-biofuels uses waste grease and oils including premium white grease (chicken fat) as its primary feedstock for the production of its products." [Exh. 10] The memo provided to Williky on August 1, 2011 discussed processing partially processed oil or fat into biodiesel and certifies that the product imported by Caravan is a 'feedstock with a pathway that is approved and qualifies under RFS2." [See, Exh. 5] Thus, the public statement in the 10-Q and the "propriety information" in the "highly confidential" memorandum provided to Williky are not inconsistent, particularly to the lay person (which Williky certainly was). There is no substantial likelihood that a reasonable shareholder would have considered whether e-Biofuels was creating its biofuel EXCLUSIVELY (which is what the SEC seems to read the work "primary" to mean) from "waste grease and oils" as disclosed on the 10-Q versus at least some of E-biofuels product being produced from imported materials that were a feedstock "with a pathway that is approved and qualifies under RFS2." Certainly, Williky did not think the work "primary" meant "exclusively" or that "waste grease and oils" was contrary to or inconsistent with the memo mention of "feedstock with a pathway that is approved and qualifies under RFS2" so long as the end product is the same—which Williky believed to be the case. [Williky Declaration, ¶ 6]
>
> Further, from the date Williky was provided with multiple opinions from experts saying Imperial's product was viable, Williky firmly believed that the company and product were solid and sustaining. [Williky Declaration, ¶ 7] Williky's August 2011 review of the "Off Spec Methly Ester" memo (Exh. 5) and the Third-Party Engineering Review (Exh. 6) written by persons with engineering degrees from prestigious school who were clearly more knowledgeable in the biofuel field than Williky with his liberal arts degree in physical education from Arizona State left him with no concerns that Imperial's product was anything but a green energy gold mine for investors. [Williky Declaration, ¶ 7] He did not consider the difference to be material and his knowledge of the memo was never a factor in his decision to trade. [Williky Declaration, ¶ 7]

Dkt. No. 48 at 20-22.

While it is unclear to the Court exactly what Williky means by the above, he appears to be claiming that he did not violate the federal securities law as alleged in the Complaint because the "off-spec" cover story was not material to investors. However, the parties have stipulated that Williky is precluded from arguing that he did not violate the federal securities law as alleged in the Complaint. Dkt. No. 34-2 at 2. The above seems to be an attempt to do so. Therefore, the Court finds it appropriate to order disgorgement of this amount as well, and **AWARDS $798,217** in disgorgement.

### 2. *Proceeds of Scalping Emails*

The SEC seeks to disgorge **$65,617** related to Williky's "scalping emails," which Williky earned by promoting Imperial stock while at the same time selling his own shares. Dkt. No. 39 at 14. Williky does not contest the disgorgement of these proceeds, Dkt. No. 48 at 26, and the Court **AWARDS $65,617** in disgorgement.

### 3. *Extortion/Severance Payment*

The SEC seeks to disgorge $1,237,500 from Williky for what it characterizes as an extortion payment and what Williky characterizes as a severance package. In response to the SEC's request, Williky argues he was not put on notice that the SEC would seek such an award and that "[t]here was no cause of action asserted for 'extorting' and it is not part of the requested disgorgement in the complaint." Dkt. No. 48 at 26. In response to this argument, the SEC notes that the Complaint does provide the allegations which form the basis of this award and that therefore Williky was put on notice.

The Court agrees with Williky. While the SEC points to a section in the Complaint entitled "Williky's Threat to Report Imperial to the SEC and EPA" as a basis for this disgorgement, Williky correctly points out that there is no specific cause of action addressing the alleged extortion. *See* Dkt. No. 1. In its Complaint, the SEC included causes of action related to

market manipulation (Counts I – II), insider trading (Counts III – V), scalping (Counts VI – VIII), and ownership disclosure (Count IX), but none related to extortion. Dkt. No. 1 at 16-22. In fact, the section to which the SEC points appears to have been included not to address extortion, but rather the insider trading of the shares received as part of the "severance." Dkt. No. at 15 ("After receiving the 300,000 shares of Imperial stock – but before the public learned of the Imperial fraud – Williky sold those shares . . . ."). Thus the factual allegation was not sufficient to put Williky on notice that the SEC would seek disgorgement of the $1,237,500,[2] as opposed to the gains made as a result of those trades. Accordingly, the SEC's request for such an award is **DENIED**.[3]

### 4. *Prejudgment Interest*

The SEC has provided calculations of the amount of prejudgment interest associated with each of the above categories of disgorgement. The parties have stipulated as to the interest rate to be used, Dkt. No. 34-2 at 2, and Williky does not contest the calculations provided. Instead, Williky argues that prejudgment interest should not be awarded for the time period during which the case was administratively closed.[4] Dkt. No. 48 at 29. However, Williky cites no authority for the proposition that prejudgment interest should not be awarded for a period in which a case

---

[2] In its Complaint, the SEC did not specify what the disgorgement should cover, instead broadly requesting in its prayer for relief that the Court "[o]rder Defendant to disgorge all ill-gotten gains and illegally avoided losses, with prejudgment interest." Dkt. No. 1 at 23. It is reasonable to read this as referring to gains obtained through market manipulation, insider trading, and scalping, and not through the alleged extortion of his employer.

[3] Because the Court denies the SEC's request for disgorgement of the alleged extortion payment, it will likewise deny the SEC's request for associated prejudgment interest.

[4] On August 26, 2015, Judge Jane Magnus-Stinson, who was previously assigned to this case, stayed and administratively closed the action pending the resolution of three related criminal actions. Dkt. No 8. Pursuant to the stay order, the SEC moved to reopen the case on January 13, 2017, following the resolution of the criminal cases, and the Court granted the motion on January 19, 2017. Dkt Nos. 13 & 15.

is administratively closed, nor has the Court located any Seventh Circuit ruling stating such.[5]

Denying prejudgment interest for the period during which the case was administratively closed would provide a benefit to Williky because "[g]iven inflation and the power of money to earn an economic return, a dollar received [between 2010 and 2012] is worth considerably more than a dollar in [2018]." *Koenig¸* 557 F.3d at 745. Accordingly, the Court will **AWARD** prejudgment interest that includes the time during which the case was administratively closed: **$159,110.13** in connection with Williky's insider trading profits and **$14,866.97** in connection with the scalping emails.

### B. Civil Penalties

The purpose of penalties is to punish and deter wrongdoers. *SEC v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996) (citing H.R. Rep. No. 101-616 (1990)). Penalties may appropriately accompany disgorgement because "[d]isgorgement is remedial and not punitive." *MacDonald*, 699 F.2d at 54. In determining penalties, "the court should consider the seriousness of the violations, the defendant's intent, whether the violations were isolated or recurring, whether the defendant has admitted wrongdoing, the losses or risks of losses caused by the conduct, and any cooperation the defendant provided to enforcement authorities." *SEC v. Church Extension of the Church of God*, 429 F. Supp. 2d. 1045, 1051 (S.D. Ind. 2005). Other sanctions the defendant faces and ability to pay may also be considered. *Id*. at 1051.

#### 1. Non-Insider Trading Penalties

For the non-insider trading violations, the SEC seeks penalties of varying degrees. For the ownership disclosure cause of action, the SEC seeks first or second tier penalties. Dkt. No.

---

[5] Williky also claims that the SEC requested that the case be administratively closed, Dkt. No. 48 at 29, however, Judge Magnus-Stinson's order does not reference such a request, nor is there any evidence of Williky opposing such an action, *see* Dkt. No. 8.

39 at 15. First tier penalties can amount to the greater of $5,000 or the gross amount of pecuniary gain to the defendant as a result of the violation, while second tier penalties, which can be applied if the action "involved fraud, deceit, manipulation, or deliberate or reckless disregard for a regulatory requirement," can amount to the greater of $50,000 or the gross amount of the pecuniary gain. 15 U.S.C. § 78u(d)(3)(B)(i) & (ii). For the five remaining counts, addressing market manipulation and scalping emails, the SEC seeks third tier penalties, which may not exceed the greater of the $150,000 or the pecuniary gain to the defendant.[6] Dkt. No. 39 at 14-15. Such penalties are appropriate if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 78u(d)(3)(B)(iii).

For market manipulation, the Court will impose one maximum penalty of $150,000. Taking into account Williky's prior settlement with the SEC regarding match and wash trading and the injunction ordered against him, *see In re Gary Williky*, SEC Release No. 36986, 1996 SEC LEXIS 741 (Mar. 18, 1996),[7] the Court believes that the maximum amount of deterrence is required. Williky has repeatedly committed these serious violations and worked to create false impressions of the markets for certain stocks, putting investors at risk.

The Court, however, declines to impose penalties for Williky's scalping emails and failure to report beneficial ownership. Here the Court notes that it has already ordered the

---

[6] As the SEC notes, while the statute reads $100,000, 17 C.F.R. § 201.1004 raised this amount to $150,000.

[7] The Court takes judicial notice of the prior SEC proceedings against Williky. *Ennenga v. Starns*, 677 F.3d 766, 773–74 (7th Cir. 2012) ("A court may take judicial notice of facts that are (1) not subject to reasonable dispute and (2) either generally known within the territorial jurisdiction or capable of accurate and ready determination through sources whose accuracy cannot be questioned.").

disgorgement of Williky's scalping profits, and that, in light of the penalties to be imposed for insider trading, further penalties for these actions would be unduly cumulative. In sum, for the non-insider trading counts, the Court will **AWARD** a penalty of **$150,000**.

### 2. *Insider Trading Penalties*

Pursuant to 15 U.S.C. § 78u-1(a)(2), the court may impose a penalty of up to "three times the profit gained or loss avoided" for insider trading. Therefore the SEC asks the Court to impose a penalty of three times the amount of disgorgement, $798,217, totaling $2,394,651. While the Court finds a tripling of disgorgement to be excessive in this case, the Court does find that a penalty of $1,596,434, equal to two times the amount of disgorgement, is appropriate. Again, the Court notes that this is not the first time Williky has had to settle a dispute with the SEC, and that Williky has not fully taken responsibility for his actions. Generally speaking, Williky has "consented to [the bifurcated settlement] without admitting . . . the allegations of the Complaint," Dkt. No. 34-1, and even when Williky does admit that he committed some of the insider trading alleged, he fails to take full responsibility, claiming he "did so only because he was not thinking clearly while stressed from threats and worried about providing for his family." Dkt. No. 48 at 22. While Williky argues that his penalty should be reduced as a result of his cooperation, *id*. at 25, his cooperation was of limited value, *see* Dkt. No. 58 at 16-18. Therefore, the Court will **AWARD** a penalty of **$1,596,434** for Williky's insider trading.

### III. Conclusion

Pursuant to the bifurcated settlement and the pending motions, the Court awards the following:

- Disgorgement of $798,217 for insider trading, along with $159,110.13 in prejudgment interest;

16

- Disgorgement of $65,617 for scalping emails, along with $14,866.97 in prejudgment interest;

- A civil penalty of $150,000 for the non-insider trading counts; and

- A civil penalty of $1,596,434 for insider trading.

The total amount awarded is $2,784,245.10.

SO ORDERED: 8/3/18

_William T. Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification